## Bartkowski Investment Group, Inc. v. Springfield Twp. Zoning Hearing Bd.

C.P. of Delaware County, No. 11-3479.

*Gregory Adelman,* for appellant.
*James J. Byrne,* for appellee.

KENNEY, J., March 30, 2012—This is an appeal from a decision of the Zoning Hearing Board of Springfield Township denying appellant, Bartkowski Investment Group, Inc.'s substantive challenge to Springfield Township's Zoning Ordinance as it relates to the exclusion of billboards.

## FACTUAL BACKGROUND

Bartkowski Investment Group, Inc. (hereinafter "BIG"), a corporation engaged in the development of outdoor advertisting, entered into lease agreements with the owners of six (6) properties in Springfield Township, intending to construct two-sided, 672 square foot billboards on the properties.[1] On December 8, 2008, BIG filed an application with the Springfield Township Zoning Hearing Board (hereinafter "ZHB") alleging that the Township's Zoning Ordinance is invalid and

---

1. Specifically, the addresses at which BIG has proposed the construction of sign structures within Springfield Township include: 891 Baltimore Pike; 800 Baltimore Pike; 794 Baltimore Pike; 500-508 Baltimore Pike; 144-166 Baltimore Pike; and 134 Baltimore Pike. By any standard, a 672 square foot sign is a billboard. In fact, the industry has defined two standard sized "billboards," this size being one of them. Therefore, there is no question in this case that a "billboard" analysis is required.

unconstitutional because it imposes a de jure total exclusion of billboards within the municipality. Specifically, BIG challenged the constitutionality of Section 143-101 (A)(5) of Springfield Township Zoning Ordinance which states, in relevant part:

§143-101, Restrictions and standards.

A. Prohibited signs. It is unlawful to erect or maintain the following signs:...

(5) Outdoor advertising billboards.

Springfield Township Zoning Ordinance, §143-101.

On March 26, 2009, the ZHB commenced hearings on BIG's application. In support of its position at the hearings, the township offered the testimony of the following individuals: Jerry Wachtel, an expert in the area of traffic safety; Joseph Mastronardo, P.E., an expert in the area of civil engineering with an emphasis on municipal engineering; Thomas J. Comitta, an expert in the field of land planning; and Detective Daniel McNeely, an expert in the area of accident reconstruction. BIG also offered testimony to support its position at the hearings, namely that of: Thaddeus Bartkowski, who testified to his experience in the outdoor advertising industry; Michael W. Tantala, P.E., an expert in the area of traffic safety; Joseph A. Platt, P.E., an expert who testified regarding the impact of the proposed billboards on traffic safety; and Larry Waetzman, an expert in the area of land planning.

On March 24, 2011, after sixteen (16) days of hearings, the ZHB issued a written decision denying BIG's

challenge. On April 12, 2011, the ZHB issued its findings of fact and conclusions of law. On May 9, 2011, BIG instituted the present Land Use Appeal.

## DISCUSSION

In Pennsylvania, where the trial court takes no additional evidence in an appeal from a decision of a zoning hearing board, the trial court's review is limited to determining whether the ZHB abused its discretion or erred as a matter of law.[2] See *In re Petition of Dolington Land Group*, 576 Pa. 519, 526, 839 A.2d 1021, 1026 (Pa. 2003). "An abuse of discretion occurs when the Board's findings are not supported by substantial evidence in the record. Substantial evidence is that relevant evidence which a reasonable mind would accept as adequate to support the conclusion reached." *Twp. of Exeter v. Zoning Hearing Bd. of Exeter Twp.*, 599 Pa. 568, 578, 962 A.2d 653, 659 (2009). The ZHB "as fact finder is the sole judge of credibility with power to resolve conflicts in the testimony and to reject even uncontradicted testimony that it finds

2. On appeal, BIG argues that the ZHB failed to render a written decision within 45 days of the last hearing, thus violating Section 916.1 of the MPC, because the ZHB's decision did not include findings of fact and conclusions of law. BIG's argument follows that this alleged lack of a decision results in a "deemed denial" of the challenge under Section 916.1 (c)(6) of the MPC and this court must review the appeal de novo. This argument, however, is without merit. On March 24, 2011, 29 days after the last hearing, the ZHB provided BIG written notice that the challenge had been denied. Contrary to BIG's position, a written decision issued by the ZHB does not need to be accompanied by findings of fact and conclusions of law to stop the 45 day period from running. See *Hammond v. Zoning Hearing Bd. of Borough of Stroudsburg*, 564 A.2d 1324, 1327 (Pa. Cmwlth. 1989) ("[T]he 45-day requirement is satisfied when the decision reached by a zoning board is communicated to the parties even though it is not then accompanied by findings of fact, by an opinion or by any explanation of the result."). Therefore, there was no "deemed denial" and the ZHB's decision is not negated.

to be lacking in credibility." *Id.* The trial court is not to reweigh the evidence presented, but rather to examine the Board's findings and determine whether there was substantial evidence to support them. See *Montgomery Crossing Associates v. Twp. of Lower Gwynedd,* 758 A.2d 285, 288 (Pa. Cmwlth. 2000).

Zoning ordinances in this commonwealth are held to be presumptively constitutional and valid, and the party challenging a zoning ordinance bears a heavy burden of proving otherwise. See *Macioce v. Zoning Hearing Bd. of the Borough of Baldwin,* 850 A.2d 882, 887 (Pa. Cmwlth. 2004). In order to overcome this presumption of constitutionality, the challenger must demonstrate that the ordinance totally or effectively excludes an otherwise legitimate use. *Id.*; see also *Exton Quarries, Inc. v. Zoning Bd. Of Adjustment of West Whiteland Twp.,* 425 Pa. 43, 58, 228 A.2d 169, 178 (1967). To prove total or effective exclusion of a permitted use, a challenger can show that the ordinance is either de jure or de facto exclusionary. *Twp. of Exeter,* 962 A.2d at 659. A de jure exclusion exists where an ordinance, on its face, totally bans a legitimate use. *Id.* A de facto exclusion exists where an ordinance permits a use on its face, but when applied, acts to prohibit the use throughout the municipality. *Id.*

In deciding a substantive validity challenge to a zoning ordinance such as the one presented by this case, Pennsylvania courts are directed to follow a two-step analysis:

[W]e first consider whether the challenging party

has overcome the presumed constitutionality of an ordinance by showing it excludes billboards as a use. If we determine that the challenger has done so, we then consider whether the municipality has salvaged the ordinance by presenting evidence to show that the exclusionary regulation bears a substantial relationship to the public health, safety, morality or welfare.

*Twp. of Exeter*, 962 A.2d at 661.

## I. *SPRINGFIELD TOWNSHIP'S ZONING ORDINANCE ENTIRELY PROHIBITS THE CONSTRUCTION OF BILLBOARDS*

In the present case, while Springfield Township's Zoning Ordinance does not prohibit all outdoor, off-premises advertising, it does entirely exclude billboards as a use. Specifically, Section 143-101 of the Springfield Township Zoning Ordinance states, in relevant part:

§143-101, Restrictions and standards.

A. Prohibited signs, It is unlawful to erect or maintain the following signs:

(5) Outdoor advertising billboards.

Springfield Township Zoning Ordinance §143-101.

On appeal, the township argues that because the zoning ordinance merely prohibits one manifestation of outdoor advertising, namely the "massive scale erection of 'billboards,'" the prohibition is not a de jure prohibition of billboards and, thus, is constitutional. In support of this proposition, the township sets forth numerous examples

of outdoor advertising that currently exist within the township, including:

> "advertising signs on SEPTA buses on Baltimore Pike; automobile wraps; bus shelters; fleet ads, or vinyl applied to vehicle advertisements; outdoor shopping cart return advertisements; supermarket shopping cart advertisements; advertisements on gas pumps, both digital and vinyl; advisements [sic] at the checkout lanes; advertisements at Automated Teller Machines; [and] free standing advertisements at the Springfield Mall."

See Brief of Township of Springfield, at 11-12. However, while this evidence does establish that the Zoning Ordinance does not entirely prohibit off-premises, outdoor advertising, the Pennsylvania Supreme Court has specifically addressed a municipality's total prohibition of billboards, stating that: "since billboards are not objectionable per se, a blanket prohibition on billboards without justification cannot pass constitutional muster."[3]

---

3. While Springfield Township permits outdoor advertising within its borders, the Pennsylvania appellate courts have analyzed "billboards" in their own category according to size, industry standards and usefulness for their fundamental purpose. See *Twp. of Exeter*, 962 A.2d at 660. This is not to say that the appellate courts look upon "billboards" favorably per se. While the Pennsylvania appellate courts have recognized that there may be appropriate locations for the construction of billboards within this commonwealth, thus not rendering them "objectionable per se," the courts have also recognized the significance of billboards as aesthetic blights in commercial and residential areas, attractive nuisances and safety hazards. While venues for billboards, therefore, may be somewhat limited to industrial and non-scenic highways, a court cannot find billboards to be per se objectionable and the courts must require the municipality to prove the requisite factual foundation when challenged to do so by a "billboard" applicant. See *id.* Once a credible factual foundation has been laid, the appellate courts have recognized a

*Twp. of Exeter*, 962 A.2d at 660; see also *Interstate Outdoor Advertising, L.P. v. Zoning Hearing Bd. of Warrington Twp.*, --- A.3d ---, 2012 WL 787395, *4 (Pa. Cmwlth. 2012) ("[A] blanket prohibition of billboards without justification cannot withstand a constitutional challenge because billboards are not objectionable per se.").

Therefore, because BIG has overcome the presumed constitutionality of the ordinance by showing it excludes billboards as a use, this court's analysis must turn to whether the exclusionary regulation bears a substantial relationship to the public health, safety, morality or welfare and is, thus, justifiable.

## II. *THE EXCLUSIONARY REGULATION BEARS A SUBSTANTIAL RELATIONSHIP TO THE PUBLIC HEALTH, SAFETY, MORALITY OR WELFARE*

Article I, Section 27 of Pennsylvania's Constitution provides:

The people have a right to clean air, pure water, and to the preservation of the natural, scenic, historic and esthetic values of the environment. Pennsylvania's public natural resources are the common property of all the people, including generations yet to come. As trustee of these resources, the Commonwealth shall conserve and maintain them for the benefit of all the people.

Pa. Const. Art. 1, §27. While property owners have a

---

municipality's right to use its police powers to entirely ban "billboards." See *id.*

constitutionally protected right to enjoy their property, this protected property right may be reasonably limited by zoning ordinances that are enacted pursuant to a municipality's police powers. See *Twp. of Exeter*, 962 A.2d at 578-79. Under their police powers, municipalities "have a significant interest in regulating billboards and other advertising because they are seen from the street and can 'distract drivers,' constitute 'traffic hazards,' and the effects of billboards on development can harm an area." *Interstate Outdoor Advertising*, L.P., --- A.3d ---, 2012 WL 787395, at *4 (citing *Norate Corp. v. Zoning Bd. of Adjustment of Upper Moreland Twp.*, 417 Pa. 397, 207 A.2d 890 (Pa. 1965)). "If a city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems that they create is to prohibit them." *Interstate Outdoor Advertising, L.P.*, 2012 WL 787395, at *4 (quoting *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 508 (1981)). The Pennsylvania Supreme Court has specifically recognized that a municipality may regulate and prohibit billboards under its police power for a combination of reasons, explaining that;

> (1) billboards being temporary structures are liable to be blown down and thus injure pedestrians; (2) they gather refuse and paper which may tend to spread conflagrations; (3) they are used as dumping places for dirt, filth and refuse, and as public privies; (4) they serve as hiding places for criminals; and (5) they are put to use by disorderly persons for immoral purposes.

Moreover, as is well known, billboards placed at certain locations, as at corners or curves, may obstruct the vision of drivers and thereby constitute a traffic menace, and the promotion of safety on public highways certainly is justification for a billboard regulation reasonably related thereto.

*Twp. of Exeter*, 962 A.2d at 660-61.

In the present case, the township supported its position that the prohibition of billboards within Springfield Township is a valid exercise of its police powers by offering evidence concerning: (1) the safety issues addressed by the municipality-wide ban on billboards; and (2) the safety issues specifically limited to the sites of the proposed billboard constructions.[4]

## A. *MUNICIPALITY-WIDE BAN ON BILLBOARDS.*

To support its position that the municipality-wide prohibition of billboards is a valid exercise of police power, the township offered evidence that established that the regulation is necessary to address and prevent the specific concerns contemplated by the Pennsylvania

---

4. On appeal, BIG argues that the evidence concerning the police powers applied to the specific locations of the proposed billboards is irrelevant because its application challenges the municipality-wide ban on billboards not merely the prohibition as it relates to the specific sites. This court, however, does not agree. The sites of the proposed billboard constructions encompass 1.3 miles of the 6.4 square mile township, The safety issues surrounding this 1.3 mile stretch of Baltimore Pike, a compact commercial no-control-of-access roadway that cuts directly through a residential area, are certainly applicable to the more prevalent residential neighborhoods of Springfield Township. It would be impracticable for a township to be required to analyze every roadway in the municipality in order to meet its burden of establishing a valid exercise of police power.

Supreme Court in *Exeter*, supra, namely:

1.  *Billboards are liable to be blown down and thus injure pedestrians.*

During the hearings before the ZHB, the township offered evidence to demonstrate that billboards have the potential to fall and injure pedestrians and that the possibility of a billboard structure being blown down by a gust of wind is a real and reasonable threat that a township should take steps to avoid. In support of this position, the township entered into evidence numerous photographs exhibiting collapsed billboards structures, including: a fallen billboard located on South Columbus Avenue in Philadelphia, Pennsylvania; a fallen, on-premises sign located at Cutler Plaza in Springfield Township; and a fallen roof billboard located at Chelton Avenue. See ZHB Opinion, at ¶236.

> Further, the township offered evidence establishing that the billboards are designed with a wind load of ninety (90) miles per hour.

ZHB Opinion at ¶237. However,

> The National Climatic Data Center ("NCDC") records reflect several storm events In 1993 in Springfield Township where wind gusts ranged from 73-112 miles per hour and two storm events in Delaware County since 1973, one of which had wind gusts of between 113 and 157 miles per hour.

ZHB Opinion at ¶240.

2.  *Billboards are inconsistent with Springfield*

*Township's Comprehensive Plan and Baltimore Pike's Green Boulevard Plan.*

At the hearings, the township established that in 2008, the Pennsylvania Department of Community and Economic Development (DCED) awarded a grant to Springfield Township to study Baltimore Pike and further implement a "Green Boulevard" concept that had been advocated in Springfield Township's Comprehensive Plan. ZHB Opinion, at ¶249. Subsequently, the Green Boulevard Plan was enacted to "promote an enhanced, pedestrian friendly streetscape along Baltimore Pike." ZHB Opinion, at ¶253; see also Springfield Township's Zoning Ordinance, available at: http://www.springfielddelco.org/Complete percent 20Zoning percent 20Packet_Exh_Map.pdf. The plan also established guidelines and requirements for the inclusion of "shade trees, street trees, streetlights and banners invoking a positive commentary on the town." See *id.*

Thereafter, the township offered the testimony of Thomas J. Comitta, an expert in the field of land planning. Mr. Comitta testified that Springfield Township did not have an appropriate place for billboards because, inter alia: any billboard would be located too close to residential neighborhoods; would be directly visible from neighborhoods throughout the township; are incompatible, incongruous and out-of-character with the historic, scenic, cohesive and aesthetic values of the township; and are undesirable, unpleasant and inconsistent with the township's Comprehensive Plan. See N.T., 9/23/10, at 35-36.

Following the hearings, the ZHB concluded that because the billboards are in the line of sight of hundreds of residential homes, an inordinately large segment of Springfield Township's residential community would be affected by the billboards and the billboards would contravene Springfield Township's Green Boulevard Plan. See ZHB Opinion, at ¶¶253, 297.

3. *Billboards may serve as hiding places for criminals and can be put to use by disorderly persons for immoral purposes.*

At the hearings, while BIG's expert, Mr. Tantala, testified that the sign faces of the billboards "can only be accessed by a bucket truck," the township offered evidence to establish that billboard structures could potentially be accessed by anyone, making them a safety hazard and also a canvas for graffiti. In support of this position, the township offered: photographs depicting a 6'1" man reaching up and nearly touching the access ladder on a billboard structure; photographs depicting existing graffiti on billboards at the Philadelphia Naval Yard; and photographs exhibiting children climbing on billboard structures. When questioned as to these photographs, Mr. Tantala testified that, "anybody can try to access [billboards] in different ways, illegally or otherwise." ZHB Opinion, at ¶181.

4. *Billboards create traffic hazards.*

At the hearings, the township's traffic safety expert, Jerry Wachtel, testified that most roadways located in Springfield Township, with the exception of Interstate

476,[5] are no-control-of-access roadways. Mr. Wachtel testified that "no-control-of-access" roadways are the least safe type of roadway because they evidence grade-level intersections with traffic control devices, such as stop signs, stop lights and yield signs, and also contain driveways and curb cuts allowing unfettered multidirectional access to the roadway. ZHB Opinion, at ¶222. Mr. Wachtel concluded that the erection of billboards on such roadways would be detrimental to traffic safety within the township because no-control-of-access roadways impose excessive demands on a driver's attention and billboards would be an additional distraction.

Following the hearings, the ZHB concluded in its written opinion that:

> off-premises signs do not serve the immediate needs of a driver in operating the vehicle and are not relevant to the safe conduct of a driver's vehicle. They present no compensating benefit to the motoring public. Their purpose is to advertise a message or a product; it bears no relationship to the driving task. While many roadway conditions can distract a driver, off-premises signs are the only objects on the roadway that have the singular purpose of distracting a driver to communicate a message. These signs are designed to capture the attention of a driver as the driver approaches the sign.

---

5. I-476 has been designated as a scenic byway by the federal government, precluding the erection of off-site advertising signs and billboards along its entire frontage. See 23 U.S.C. §131 (s) (describing control of outdoor advertising along federally designated scenic byways); see also http://bywaysonline.org/inventory/states/PA (listing federally designated scenic byways in Pennsylvania).

ZHB Opinion, at ¶211-12. Further, the ZHB concluded that:

> driver distraction is adverse to traffic safety because it leads drivers to make errors while driving. Driver distraction is largely studied and many scholarly reports exist enumerating the danger of driver distraction. It is the objective of the billboard industry to get drivers to look at their signs instead of the roadway. This is a detriment to traffic safety when such additional distraction cannot be tolerated.

ZHB Opinion, at ¶225.

   5. *Billboards have the potential to create other safety issues.*

BIG's safety expert, Michael Tantala, testified that the installation of a billboard structure requires the erection of a monopole that has a tapered diameter starting at forty-eight (48) inches at the base and tapers to forty-five (45) inches at the peak. See ZHB Opinion, at ¶46. The installation of this monopole requires excavation of up to 20 to 30 feet in depth. Mr. Tantala elaborated that the excavation is performed by using a drill or pneumatic equipment and the excavation could potentially have negative effects on buildings located adjacent to the excavation. See N.T., 7/23/2009, at 93.

   B.   *CONCERNS SURROUNDING SPECIFIC BILLBOARD SITES*

As to the evidence concerning the specific locations and safety concerns surrounding the proposed billboard

sites, the ZHB made, inter alia, the following findings of fact:

52. Baltimore Pike, in Springfield Township, is a no-control-of-access roadway which exhibits numerous intersections, curb cuts for business access, grade changes that cause variance in traffic speed, pedestrian crosswalks and frequent SEPTA bus stops in the traveling lane without shoulder pull-off.

55. There are 81 ingresses/egresses from business or community places, such as churches and parks, onto Baltimore Pike in the 1.3 mile affected area.

185(a). At the Thompson Ave. intersection, near the proposed sites of 891 Baltimore Pike, during the time of observation [Nov. 21-23, 2009, from 7:00 A.M. to 9:00 A.M. and 2:00 P.M. to 6:00 P.M.] there were 3,276 vehicles, 894 of which were turning. There were 17 pedestrians observed during these hours and 38 buses.

185(d). At the Thompson Ave. intersection, near the proposed sites for the 791 and 800 proposed billboards, there were 3,730 vehicles observed, 1,186 of which were turning. There were also 44 pedestrians observed during these hours and 37 buses.

185(e). Between the proposed 800 Baltimore Pike and 500-508 Baltimore Pike locations there are 43 driveways, 12 pedestrian crossings, 5 bus stops, 3 bus shelters and 5 roadway intersections.

185(f). At the West Avenue intersection, near the

proposed site of 166 Baltimore Pike, during the time of observation, there were 3,242 vehicles, 490 of which were turning. There were 22 pedestrians and 41 buses.

186. The Board finds that in the stretch of Baltimore Pike that is proposed for the billboards there are a total of;

[a] fifteen [15] intersections;

[b] one-hundred and twelve [112] driveways;

[c] twenty-seven [27] pedestrian crossings;

[d] nineteen [19] bus stops; and

[e] eight [8] bus shelters.

217. The 1.3 mile stretch of Baltimore Pike contains several hundred on-premise signs.

218. The 1.3 mile stretch of Baltimore Pike also contains off-premises signs, including bus shelters, outdoor shopping cart return advertisement, supermarket shopping cart advertisements digital and vinyl advertisements on gas pumps, vehicle wraps, SEPTA bus advertisements, fleet ads or vinyl applied to vehicle advertisements.

223. Baltimore Pike is a challenging roadways to drive because it demands careful attention to the driving task due to the number of variables involved.

224. In addition to the complete lack of access controls on Baltimore Pike, there are additional complications to

the driving task including school bus traffic and SEPTA transit bus stops, frequent incidents of pedestrian jay-walking due to the widely spaced crosswalks and existing prolific signage both on-premises and "off-premises."

228. Considering the size, height and distance from which they will be seen, the proposed billboards are detrimental to traffic safety. They will impose excessive demands on drivers' attention patterns and will serve the sole purpose of distracting drivers on a roadway that already exhibits excessive driver distraction through existing signage and lack of control access.

242. [a] 891 Baltimore Pike - the "collapse zone," in different directions for this sign impact drivers on Baltimore Pike, the utilities on Baltimore Pike, the Springfield Square Shopping Center, parking and pedestrian walkways. The fail zone impacts the parking area, there is parking directly below the proposed sign. If anything were to fall from the sign structure, any vehicle parked below the falling item would be impacted.

[b] 800 Baltimore Pike - the "collapse zone," in different directions for this sign, and the fail zone impacts pedestrian walkways, the T-Mobile building and adjacent parking areas.

[c] 794 Baltimore Pike - the "collapse zone," in different directions for this sign impacts the Pandolfi Carpet building, parking at the adjacent Rothrock Chevrolet business and the pedestrian walkways on Baltimore

Pike.

[d] 500-508 Baltimore Pike - the "collapse zone," in different directions impacts the building, structures and parking for the strip center. This sign is proposed to hang directly over the roof of the strip mall stores on the property.

[e] 144-166 Baltimore Pike - the "collapse zone," in different directions for this sign impact the traveling public on Baltimore Pike, the access drive to the property, the parking area for the strip of stores and an adjacent drive for the Liberty Diner, the Liberty Diner building and the access to the parking area for the Netherwood Park.

[f] 134 Baltimore Pike - the "collapse zone," in different directions for this sign impacts the parking area, parallel parking in front of Klaussner's, the Klaussner building, the adjacent commercial property, the access drive to Netherwood Park and the southbound travel lane of Baltimore Pike.

249. Mr. Comitta testified that it is his expert opinion that the six proposed billboard sites are inappropriate, as follows:

[a] The size and scale are excessive in comparison to existing signage on Baltimore Pike.

[b] The billboards are excessive for the lots, meaning that the lots exhibit a lack of screening, small lot areas, narrow lot widths, existing building coverage and

problems with soning code requirements for setbacks.

[c] The billboards are not compliant with the zoning ordinance for side yard setback, front yard setback, rear yard, height of structures and sign face area.

[d] The billboards are proposed too close to residential neighbors.

[e] The billboards, if erected as proposed, will have direct visibility from residential neighbors.

[f] The billboards are incompatible and incongruous with the existing land use from a land planning perspective.

[g] The billboards are out of character with the neighbors and the streetscape from a historic, scenic and esthetic standpoint.

[h] The billboards cannot be buffered due to their height.

[i] The billboards, as proposed, are too close together.

[j] The billboards, as proposed, are inconsistent with many of the provisions of the comprehensive plan.

[k] The billboards are unlike anything else within the view shed, or the area within which the billboards will be visible.

[l] The billboards are unlike anything else within the view shed and should not be permitted in settings that are historic, scenic and esthetic.

[m] The billboards are not compliant with the Baltimore Pike Green Boulevard Plan. BIG's application to this board was made just after the Pennsylvania Department of Community and Economic Development awarded a grant to Springfield Township to study Baltimore Pike through the lens of the Green Boulevard Plan. The state was convinced that the Springfield Township's Comprehensive Plan was heading in the right direction. The billboard proposal is diametrically in opposition to the Green Boulevard Plan for Baltimore Pike.

253. Billboards at a height of 62 feet will change the visual character of a large portion of Springfield Township; the sense of character of a street in conformance with the Green Boulevard Plan with shade trees, street trees, streetlights and banners invokes a positive commentary on the town. By way of contrast, if the tallest figure seen is a 62 foot high billboard, it becomes different and depending on the color, height, message and lighting, you get a different sense of character.

254. The billboard proposed for 891 Baltimore Pike is in close proximity to a day care center, a middle school, residential areas and a bus stop. It is nearly two times as high as the adjacent buildings and residences, utility poles, street lights and traffic signals. This billboard would intrude into the residential areas and be visible from the Rocklyn Road neighborhood.

294. This Board finds that the proposed billboard at 891

Baltimore Pike would be adverse to the public health, safety and welfare of the community for the following reasons:

[a] The billboard would place extra and unnecessary demands on drivers traveling Baltimore Pike which would take drivers' attention off of the primary task of driving on an already congested roadway that exhibits no control access;

[b] The billboard would place extra and unnecessary demands on drivers on Baltimore Pike which would take their attention off their primary task of driving on a roadway that has pedestrians and bicycles crossing legally at cross walks as well as illegally by jay-walking;

[c] driving on a roadway where SEPTA buses do not have a dedicated bus lane requiring them to stop on the congested roadway;

295. [a] Because all six billboards proposed for Springfield Township are along the same 1.3 mile stretch, the public health, safety and welfare concerns for each are largely congruent. Therefore, the reasons set forth above regarding 891 Baltimore Pike also apply to [the other proposed] billboards.

See ZHB Opinion, ¶52-295. At the conclusion of its Opinion, the ZHB summarized its findings as follows:

this Board finds that Springfield Township has met its burden of proof with clear and convincing evidence that; [1] the 1.3 mile stretch of Baltimore Pike where the

proposed billboards would be constructed is presently a highly trafficked road: [2] there are numerous dangerous conditions currently along Baltimore Pike which require a driver's complete and total attention while performing the driving task; [3] the proposed billboards would further complicate the driving task, placing the public at further risk of bodily injury and/or death, as well as, additional property damage; [4] the proposed billboards would be the tallest structures on the 1.3 mile stretch of Baltimore Pike; [5] there is no way to adequately buffer the billboards to shield them from neighboring residences; [6] the neighboring residential properties will have a clear view of the billboards during the day and the light emanating from them during the evening hours; [7] the billboards will cause the neighboring residences both a personal and financial hardship; [8] regulating the billboards is a valid police power of Springfield Township; [9] protecting the neighboring residential properties that will be directly affected by the proposed billboards as well as pedestrians and the driving public who will be exposed to additional dangers due to greater driver distraction, are also valid police powers; [10] all of the elements which were found in the [ ] *Exeter* case[ ] exist along Baltimore Pike, therefore, this Board is bound by these decisions. Not every use is suitable or appropriate for every municipality.

## CONCLUSION

At the conclusion of the hearings, the ZHB weighed the testimony and evidence presented and ultimately

concluded that the township established that the exclusionary regulation bore a substantial relationship to the public health, safety, morality or welfare. Based on the record before this court and the findings of the board there is substantial evidence to support the board's decision. Therefore, for the foregoing reasons, this court hereby enters the following:

## ORDER

And now, March 30, 2012, upon consideration of the Appeal from the March 24, 2011 decision of the Springfield Township Zoning Hearing Board, the briefs submitted by the parties and the argument held on March 23, 2012, it is hereby ordered that the decision of the Zoning Hearing Board is affirmed.